## Case No. 13,317.

### STARR v. STARK.

{2 Sawy. 603, 642; 1 Am. Law T. Rep. 444.] [1]

Circuit Court, D. Oregon. May 8, 1874.[2]

JUDGMENT—RES JUDICATA—ESTOPPEL—CONTRACT—POWER OF ATTORNEY—REVOCATION—RATIFICATION—OREGON DONATION ACT—TITLE UNDER—APPEAL—OBITER DICTA.

1. Starr being in possession of certain lots in Portland, Oregon, filed a bill in chancery against Stark, to determine an adverse claim of title by the latter, in which the complainant, as one ground of relief, alleged title derived to himself through a United States patent to the city of Portland, and that defendant claimed title adversely under a subsequent patent to himself. And, as another ground of relief, that the legal title was in defendant under his said subsequent patent; but, that through certain transactions set out, complainant had the equitable right, and was entitled to a conveyance of said legal title. The court, upon motion of defendant. held that the two grounds of action were inconsistent, and could not be litigated together in the same action, and required complainant to elect upon which he would proceed, and omit the other; whereupon complainant, after excepting to the ruling and order, elected to rely on the first, and withdraw the second. A decree having been rendered in favor of complainant. on the cause of action retained, which was affirmed by the supreme court of Oregon. it was finally reversed by the supreme court of the United States, on the ground that the patent to the city was void, and the bill subsequently dismissed in pursuance of the mandate of that court. Complainant then filed a second bill, alleging the equitable title before set up in the first, and withdrawn in obedience to said order of the court, and prayed a conveyance of the legal title: Held, that the proceedings and decree, in the former action, are not a bar to the second action.

2. An irregular conveyance, by one acting under a power of attorney, of a possessory claim to public land. asquiesced in and acted upon by the principal, the consideration having been enjoyed by him, will vest in the grantee the equitable title to the interest purported to be conveyed.

3. Written contracts should be construed in view of the circumstances and condition of things in which they originated.

4. Subsequent acts of the parties, tending to show the construction put upon the contract by the parties themselves, may, also, be considered where the meaning is doubtful.

5. Lownsdale, Coffin and Chapman claimed to be owners of the Portland land claim, being a possessory claim on the public lands of six hundred and forty acres, upon which the city of Portland was laid out, Coffin and Chapman deriving their interest through conveyances from Lownsdale. Stark claimed to own an undivided half of said land claim. Lownsdale and Stark, at San Francisco. entered into an agreement, dated March 1, 1850, to settle their conflicting claims, by which Lownsdale, with specified exceptions of sales made before the first of January previous. which were confirmed, conveyed to Stark all his interest in the part lying north, and Stark to Lownsdale all his interest to the part lying south, of a certain line. The instrument executed contained a covenant. that in case "any person or persons," holding interests under Lownsdale, with cer-

tain exceptions, "shall refuse to ratify and confirm" this agreement, then the agreement might be canceled, at the option of Stark, within six months: Held, that Coffin and Chapman were embraced in the terms of this covenant, and that the object was. in this mode. to make them substantially parties to the agreement, and, as such, to secure their assent thereto.

6. The said indenture, between Lownsdale and Stark, dated March 1, 1850, ratified and confirmed certain sales made by each prior to January 1, 1850. Coffin, Chapman and Lownsdale (the latter acting by Chapman, his attorney in fact), had made other dispositions of property subsequent to January 1, and prior to April 13, 1850, at which latter date Coffin and Chapman first had notice of said compromise. Coffin and Chapman indorsed, on said compromise agreement, an instrument in writing, by which they "ratify and confirm" the same, with a modifying or further clause, "hereby placing the disposition of property, up to notice of said adjustment, upon the same footing with dispositions of property before the first of January last," under which instrument Couch, in the name of, and as attorney for, Stark, indorsed and executed an instrument as follows: "I ratify the above agreement, so far as my interest is concerned, in said property:" Held, that these last two instruments constituted a modification of the said original indenture between Lownsdale and Stark, so as to ratify and confirm, on the part of Stark, to the extent of his interest. all dispositions of lots made by Coffin, Chapman and Lownsdale, through Coffin and Chapman, during Lownsdale's absence in San Francisco, from January 1st to April 13, 1850, and to ratify and confirm said contract, as so modified by the parties in interest.

7. A power of attorney to Couch, authorizing him "to do any and all acts during my (Stark's) temporary absence, which I might myself do were I personally present," together with accompanying letter of instructions to settle the difficulty about his undivided half, are sufficient authority to Couch to make said modification, under the circumstances shown in the case.

8. A revocation of a power is not necessarily implied from a subsequent power to another party to do the same thing. When the second power is not absolutely inconsistent with the first, the question whether it was intended to revoke the other must be determined by the circumstances of the case.

9. After the modification of said contract each party occupied the part released to him without objection from the other, and without claim to the part released by himself, and performed many other acts consistent with a recognition of the validity of said modified agreement, and inconsistent with any other view: Held, that said subsequent acts of Stark constitute an adoption and ratification of the acts of Couch, as his attorney; and that the equitable title to his interest in the said lots, sold between January 1st and April 13th, by virtue of the said several transactions, passed to the grantees of Coffin, Chapman and Lownsdale.

10. A party can not adopt that part of an agreement made on his behalf, without authority, which is beneficial to himself, and repudiate the part which is beneficial to the other party.

11. Where a donee, under the "donation act" of September 27, 1850, subsequent to the initiation of the four years' possession required by the act to entitle him to a patent, which is afterward ripened into a legal title by the issue of the patent, and before the passage of the said act, has conveyed all his right, title and interest, together with the possession in and to a portion of the land so possessed and claimed by him, without covenants for further convey

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission. 1 Am. Law T. Rep. 444. contains only a partial report.]

[2] [Affirmed in 94 U. S. 477.]

ance. or by quit-claim deed, and said land is thereafter possessed and occupied by his grantee, such conveyance is recognized and protected by said donation act, and the equitable interest in the land so conveyed passes to his said grantee; and a court of equity will enforce the equity by compelling such donee to convey the legal title vested in him by the patent subsequently issued.

12. When the record fairly presents two points upon the merits in a case, upon either of which the appellate court might rest its decision, and the court actually decides both, without indicating that it is intended to rest the judgment upon one rather than on the other, the decision upon neither can be regarded as obiter.

[Followed in Hawes v. Contra Costa Water Co., Case No. 6,235. Cited in Huntington v. Palmer, 8 Fed. 450.]

The complainant and his grantors having been for many years in possession of lots one and two, and the north half of lot four, in block eighty-one, in the city of Portland, the premises in controversy, the defendant Benjamin Stark, on December 22, 1868, commenced an action on the law side of the court for their recovery, in which judgment for the possession thereof was rendered in favor of said Stark, February 15, 1870. [Case No. 13,-307.] The complainant [Lewis M. Starr] then filed this bill in equity, setting up what he claims to be a good, equitable title to the premises as against defendant, Stark, and praying that defendant be decreed to convey the legal title, and be enjoined from executing his judgment at law for the possession, etc.

[A motion for a preliminary injunction against Stark to enjoin him from setting up his legal title was denied. Case No. 13,316.]

The following facts satisfactorily appear, either from the admissions of the pleadings or the evidence:

On September 22, 1848, Francis W. Pettygrove executed to Daniel H. Lownsdale a conveyance, which purported, in consideration of the sum of five thousand dollars, to convey to the latter all the "right, title, interest, claim and demand in law, and in equity, present and in expectancy," of said Pettygrove to a certain tract of land specifically described, containing about six hundred and forty acres, "together with all and singular the houses, out-houses, fences, wharves and other improvements," excepting certain designated lots. On March 22, 1849, Stephen Coffin, by conveyance from, and agreement with, said Lownsdale, became the owner of one half of the interest so acquired by said Lownsdale in said land claim. On December 13, 1849, by further conveyance from Lownsdale and Coffin, Wm. W. Chapman became the owner of one third interest in said land claim, the three, from that time, holding and dealing with the same as partnership property. The several conveyances and agreements between these parties; their acts under them in connection with the said Portland land claim; the general facts of the case, and condition of affairs at Portland at the time, are the same as fully set out in the case of Lamb v. Davenport [Case No. 8,015], and

need not be repeated here. From said March 22, 1849, Lownsdale and Coffin, and, from said December 13, 1849, Lownsdale, Coffin and Chapman were in the possession of said land, except such town lots as had been from time to time sold by these parties, and their grantors, claiming the title thereto under said several conveyances and agreements against all the world except the United States, or, in other words, all the title that at that time it was possible for a private party to obtain under the laws of the United States—the real title being in the government, and there being yet no law authorizing a sale or conveyance of the government's title. They actually lived upon the land, cultivated portions of it, improved it, erected houses thereon, and occupied others already built; exercised acts of ownership over the land, which were generally recognized by the inhabitants of Portland, and laid off portions into blocks and lots, and sold them as town property. Although the tract does not appear to have been enclosed by a fence, yet these parties entered and claimed under deeds, with designated boundaries, and this, in connection with living upon it, and performing the acts indicated, upon well settled legal principles, constituted possession of all of said tract not actually adversely occupied by other parties. Hicks v. Coleman, 25 Cal. 122, and cases cited, including cases in the United States supreme court; Ayres v. Bensley, 32 Cal. 620. They continued so in possession of said land claim, disposing of town lots, till April 15, 1850, during which time certain transactions took place which will now be mentioned. About January 8, 1850, said Lownsdale departed from Portland for San Francisco, leaving Coffin and Chapman in charge of the said land claim. Before his departure, on January 7th, he executed a power of attorney to Chapman, being "Exhibit A," annexed to Chapman's deposition in evidence. It is brief, and, in general terms, authorizes Chapman "to superintend and transact my business in said territory during my absence;" "to do and perform anything pertaining to my interests in Oregon which he, in his judgment, may think advisable, particularly in signing deeds to Portland lots"—this last clause containing the only particular specification in it. Lownsdale met defendant, Stark, at San Francisco. Stark had before set up a claim to an undivided half of the Portland land claim, which he now insisted on. He claimed that the Portland land claim had been taken up and held by said Pettygrove, not alone, but in conjunction with one Lovejoy; and that Lovejoy had conveyed his half interest to him (Stark) and by virtue of said alleged right of Lovejoy and conveyance to himself, he claimed title to an undivided half.

Subsequently, Lownsdale and Stark came to a settlement of their controversy by fixing upon a certain designated east and west line, nearly coincident with the street in Portland, now known as Stark street, Lownsdale agreeing to relinquish to Stark, with certain speci-

fied exceptions, all his right, title, interest and claim in and to that part of the Portland land claim lying north of said line, and Stark to relinquish to Lownsdale, with certain exceptions, all his right, title and interest in and claim to that part lying south of said line. Lownsdale and Stark are the only ostensible parties to this agreement. In pursuance of this arrangement, Lownsdale and Stark, at San Francisco, on March 1, 1850, executed, under their hands and seals, an instrument in writing, bearing date on that day, a copy of which is annexed to the bill of complaint, as "Exhibit A." This instrument, among other things, contains the recital: "Whereas, it is deemed expedient by the parties hereto, to determine, settle and adjust the title and possession of certain lands hereinafter described, and to preclude all future controversy in the premises," etc. It, then, on the part of Stark, purports to "bargain, sell, remise, release and forever quit-claim to Lownsdale, his heirs and assigns," "all his right, title and interest in all that portion" of said "Portland land claim," "situate south" of the line agreed upon, "hereby ratifying and confirming, so far as his right, title and interest is concerned, all conveyances which" Lownsdale "has heretofore made, or may hereafter make, in the premises hereinbefore quit-claimed." And, on the part of Lownsdale, it purports to make a similar sale, conveyance, etc., to Stark, with similar ratifications with respect to all of said land situate north of said line. It also contains the following covenants, which it is important to consider in this case. Firstly, Stark covenants that he, "so far as his right, title and interests are concerned, hereby ratifies and confirms all conveyances made by the said party of the second part (Lownsdale) or his lawful attorney, previous to the first day of January, one thousand eight hundred and fifty," of certain lots specifically described "lying north of said line," that is to say, in the part conveyed to Stark. "And said Stark likewise ratifies and confirms all grants or conveyances made of said party of the second part (Lownsdale) or his lawful attorney, in good faith and for a valuable consideration, to this date (March 1st), subsequent to said first day of January, of said lots situate north of said line," that is to say, in the part released to Stark. "Provided always, and said party of the second part (Lownsdale) hereby covenants for himself, his heirs, etc., that he will pay over all sums of money which have, since the first day of January, been, or may hereafter be, paid unto the said party of the second part, etc., in consideration of the grants and conveyances aforesaid"—that is to say, made subsequent to January 1st. And, secondly, Lownsdale further covenants "that, in case any person, or persons, holding or claiming under him, except the holders of those lots, and under the conveyances especially hereinbefore confirmed by said party of the first part (Stark), shall refuse to ratify and confirm this indenture, he, the said party of the second part (Lownsdale), will, at the option of the said party of the first part (Stark), at any time within six months from this date, cancel and release all rights acquired under these presents by the parties hereto."

Either before Lownsdale left for San Francisco, by Lownsdale, Coffin and Chapman, or after he left, and prior to March 20, 1850, by Coffin and Chapman—and it does not appear which—blocks seventy-eight, seventy-nine, and fractional block eighty-one, of the town of Portland, were laid off on said land claim. On March 20, 1850, before Lownsdale's return, and before Coffin and Chapman had notice of the said agreement between Lownsdale and Stark, dated March 1, 1850, Coffin and Chapman, acting for themselves, and Chapman, assuming to act for Lownsdale as his attorney under said power of date January 7, 1850, fixed a price upon said three blocks, valuing lots seventy-eight and seventy-nine at $3,000 each, and fractional block eighty-one at $2,000, and agreed that each should take one of these blocks at those prices; Lownsdale to have block seventy-eight, Coffin seventy-nine, and Chapman fractional block eighty-one. Conveyances to the respective parties were accordingly made on that day, bearing date March 20, in pursuance of this arrangement. "Exhibit F," of the evidence is a copy of one of the said deeds, being the deed to Chapman. It purports to be a deed from Coffin, Lownsdale and Chapman, "proprietors of Portland," to Chapman, and in consideration of the sum of $2,000, the receipt of which is acknowledged, to release, confirm and quit-claim to Chapman "lots numbers one, two, three and four, in fractional block number eighty-one, being the warehouse fraction," etc. There was, at the time, a warehouse upon the block. The deed was signed Stephen Coffin, D. H. Lownsdale, by his attorney in fact, W. W. Chapman, and W. W. Chapman. The sums agreed upon were charged to each of these parties, respectively, in the accounts of their transactions between themselves in relation to the business of selling town lots; and, after Lownsdale's return, adjusted and allowed in the settlement of these matters between the parties, Lownsdale acquiescing in the arrangement made in his absence. Chapman, after said conveyance, went into the actual possession of the block, and thereafter possessed and claimed it under the said arrangement and conveyance till he sold the several lots to defendant and his grantors. Said fractional block includes the premises in controversy, and is situate north of said line designated in said instrument of March 1, 1850, executed by said Lownsdale and Stark, and within the tract thereby purporting to be conveyed by Lownsdale to Stark. Other sales had been made by Coffin and Chapman during Lownsdale's absence.

After March 20, 1850, and either on or within two or three days before April 13, 1850,

Lownsdale returned to Portland from San Francisco; and, after said return, Coffin and Chapman were informed, for the first time, of the said arrangement, and execution of the said indenture of March 1, 1850, between said Lownsdale and Stark; and, upon being so informed, refused to ratify or confirm said contract. At that time John H. Couch was a partner of said Stark in mercantile business, carried on at Portland in a store situate but a short distance from said block eighty-one. He professed to be the agent of Stark in respect to the interest claimed by him in the Portland land claim, and assumed to act as such. After some negotiations between Coffin and Chapman, and Couch, in reference to said claim, and the said indenture executed by Lownsdale and Stark, the said parties came to an understanding, and, in pursuance thereof, executed and appended to said indenture, by indorsement thereon, instruments, of which Exhibits B and C, annexed to the bill, are copies. The first is as follows, to-wit: "We, Stephen Coffin and W. W. Chapman, partners with Daniel H. Lownsdale in the town of Portland, hereby ratify and confirm a certain agreement between Benjamin Stark and D. H. Lownsdale, bearing date the first day of March A. D. 1850, respecting an adjustment of title, hereby placing the disposition of property up to notice of said adjustment upon the same footing with the disposition of property before the first day of January last. In testimony whereof, we have hereunto set our hands and seals this the 13th day of April, A. D. 1850. (Signed) S. Coffin, (L. S.) W. W. Chapman, (L. S.)" Under which is the following, to-wit: "Portland, O. T., April 15, 1850. I ratify the above agreement as far as my interest is concerned in said property. (Signed) John H. Couch, for Benj. Stark."

Before the execution of said last named instrument by said Couch, for said Stark, on September 26, 1849, said Stark had executed a power of attorney to said Couch, of the most general character, without any enumeration of specific acts to be performed. Its language is, "to do any and all acts, during my absence from this territory, which I might, myself, lawfully do were I personally present." The said indenture of March 1, 1850, and the two instruments of ratification indorsed thereon, the one executed by Coffin and Chapman, and the other by Couch for Stark, were all recorded together, in the proper recorder's office, on November 23, 1850, at the request of George Sherman, who, at the time, represented himself as acting as attorney for Stark and Couch. After the execution of said several instruments, Lownsdale, Coffin and Chapman relinquished all possession and all claim to the portion of the Portland land claim not embraced in said indenture, as modified by said instruments, situate north of said line agreed on, and Stark all claim to the lands south of said line—each party thereafter possessing and exercising acts of ownership over the part so relinquished to him. Stark returned to Portland in June, 1850, when he was furnished by Coffin and Chapman with a list of the lots sold before the date of said modification of contract. Couch and Sherman had, before the execution of said instruments of ratification, been furnished a list of all lots sold during Lownsdale's absence. Stark, also, after said return and notice, stated to Coffin that he would sanction or submit to the contract as modified, and carry out its provisions; and he never did, down to the date of his patent, make any claim to the lots so embraced within said modification, either upon Lownsdale, Coffin or Chapman, or upon any of the parties in possession as their grantees. September 27, 1850, the donation act was passed by congress, under which Stark, on September 10, 1853, obtained from the surveyor-general a donation certificate to the part of the Portland land claim so lying north of said agreed line, released to him as aforesaid, he having dated his possession in his notification from September 1, 1849. Upon this certificate a patent of the United States issued to Stark, dated December 8, 1860, being the patent which vests in him the legal title to the lands in controversy.

Lownsdale, Coffin and Chapman, also, in pursuance of an agreement between themselves, dated March 10, 1852, commonly called the "Escrow," set out in Lamb v. Davenport [Case No. 8,015], before referred to, divided that portion of the Portland land claim lying south of said line among themselves; and each, respectively, obtained a similar donation certificate and patent thereon to the part of said tract allotted to him, under said agreement.

On October 3, 1850, said Chapman, being then in possession of said block eighty-one, conveyed to complainant, Starr, the south half of said lot two; and on October 8, 1850, the north half to one Butler. On November 11, 1850, Chapman conveyed said lot four to one Powell, and on January 30, 1851, said lot one to Winter and Latimer. All the right, title and interest so derived from Chapman in and to said lots in controversy, so conveyed by Chapman to parties other than complainant, Starr, had, since said conveyances from Chapman, and before defendant's patent issued, by mesne conveyances, become vested in complainant, Starr. All of said conveyances were for a valuable consideration, and the said several grantees from Chapman, under said conveyances to them, entered into actual possession, and erected valuable improvements on said lots; and all the said premises have been in the actual possession and occupation of Starr, and his several grantors, for mercantile and other business purposes, ever since their said several entries under, and soon after their said several purchases from Chapman. The said premises have always been, from 1850 to the pres-

ent time, in the heart of the business part of Portland.

On December 7, 1860, one day prior to the issue of said patent to Stark, a patent of the United States in due form, issued to the corporate authorities of the city of Portland for the tract of land upon which said city is located, which patent includes the lots in controversy. It purports to have been issued under the act of congress of 1844, known as the "Town Site Act," and to grant the land "in trust for the several use and benefit of the occupants thereof according to their respective interest." It also reserves "any valid claims which may exist in virtue of the several donations of Benjamin Stark, certificate No. 69," and of Daniel H. Lownsdale, William W. Chapman and Stephen Coffin, under their several certificates. The patent to Stark, on said certificate 69, issued on the next day, contains a similar reservation of any rights that may exist in favor of the city of Portland. The complainant, Starr, and his brother, Addison M. Starr, at the date of said patents, were in the occupation of the premises in controversy, claiming the possessory title as hereinbefore set out, and were, therefore, as to these lots, the parties for whose benefit the legal title thereto, so far as any passed, vested in the city of Portland by virtue of said patent of December 7, 1860.

In January, 1864, said Addison M. Starr, and the present complainant, Lewis M. Starr, being at the time in possession of said premises in controversy, in conformity with the provisions of the statute of Oregon authorizing said proceedings, filed their bill on the equity side of the circuit court of Oregon, for the county of Multnomah, against said defendant Stark, to determine his adverse claim made under his patent. An amended bill was filed in August, 1864, in which the complainants alleged two separate grounds of relief. In the first they set up a title in themselves, relying on the title derived through the patent to the city of Portland; secondly, they set up the equitable title upon which they now rely, and claimed that Stark should be adjudged to hold the legal title derived under his patent in trust for them. They prayed that Stark's patent should "be set aside and held for naught, and that he be held to release to plaintiffs all his right, title and interest, claim and demand, to said lots, etc." On October 28, 1864, an order was entered in the cause by said court by which the complainants "are ordered to elect which cause of suit they will proceed upon, and to set forth the same in the amended bill to be filed, to which order, requiring the plaintiffs to elect, the plaintiffs except." In obedience to said order the complainants elected to rely upon the patent to the city, and accordingly, on November 1, filed a second amended bill or complaint, as it is designated in the Oregon Code of Practice, in which the cause of action now relied on was omitted, and the cause of action resting upon the title, derived through the patent to the city, and the fraudulent procuring of a patent by Stark, more fully set out. Issue having been taken on the complaint, and the case heard on the testimony introduced, the circuit court entered a decree in favor of the plaintiffs, in pursuance of the prayer of the complaint, which decree was affirmed on appeal by the supreme court of Oregon. An appeal having been taken thence to the supreme court of the United States, that court held the patent to the city to be void, and that to Stark valid, reversing the decree of the supreme court of Oregon, and remanding the case, with instructions to enter a decree directing the circuit court to dismiss the action [6 Wall. (73 U. S.) 402], which was accordingly done, and the action finally dismissed in pursuance of said mandate and directions. The defendant Stark now sets up these proceedings in his answer, and insists that, by reason thereof, the cause of action now relied on is res adjudicata, and the former decree a bar to further litigation.

J. N. Dolph and Wm. H. Effinger, for complainant.

Wm. Strong and Bronaugh & Catlin, for defendant.

Before SAWYER, Circuit Judge, and DEADY, District Judge.

SAWYER, Circuit Judge. The order of discussion pursued by counsel will be followed, and the question presented by the answer of a former adjudication first disposed of. It is not pretended by defendant's counsel that the cause of action now relied upon was, in fact, put in issue, litigated and determined in the former action; but it is insisted that it might, and therefore ought, to have been so presented, litigated and adjudged; and, this being the case, that the decree in that action is just as conclusive as if it had been so determined. It is conceded that the ground of relief now relied on was at first set up in the complaint as one ground of action in connection with the cause of action, which was actually tried and determined; that the court held the two causes set out to be inconsistent and incompatible, and required the plaintiffs to elect upon which cause they would rely, and omit the other; and that, in obedience to this order, plaintiffs did elect, and omitted the one now set up, relying upon the other; but it is insisted that the court erred in this ruling; and although there was error, it was incumbent on plaintiffs to have had it corrected on appeal; and that, failing to do that, they are barred by the ruling, and that the decree is as conclusive upon the whole title as if this ground of relief had been in fact litigated and adjudged. The complainants, on the other hand, insist that the two causes of action were inconsistent, and for that reason could not be properly relied on by plaintiffs and litigated in the same action; and that

the order compelling plaintiffs to elect was correct. If wrong in this view, it is still insisted that, since the title now set up was not in fact litigated, and not permitted to be litigated, the proceeding in the former case is not res adjudicata.

It is quite clear to my mind, that the order compelling plaintiffs to elect upon which cause of action they would rely, and omit the other, was erroneous. The facts constituting the grounds upon which the plaintiffs claimed equitable relief in both cases alleged are entirely consistent with each other. Only the legal conclusions that might be insisted on, could be inconsistent. It might be claimed, and was claimed, by the opposing counsel, that under one patent the legal title was in the city. If that had been true the patent to Stark would of course have been void, and a cloud on the title, derived through the patent to the city, and the plaintiffs' equity, in respect to the city, rested upon the grant to the city in trust for their use and benefit, under the act of congress, as occupants of the premises in question. On the other hand, the legal title having rested in Stark, under his patent, as decided by the United States supreme court, upon the same state of facts as that under which title in or through the city was claimed, the patent to the city was void, and the plaintiffs' equities as against Stark depended upon the additional, but consistent, acts of plaintiffs and Stark alleged in the omitted cause of action, as affecting their individual rights. There can be no good reasons, it seems to me, why the plaintiffs should not have been permitted to allege the real facts upon both theories as they existed, and have since been proved, and leave the court to draw the correct conclusion therefrom, and give such relief as the plaintiffs were entitled to receive, if found entitled to any, in accordance with the legal or equitable conclusion adopted. If the circuit court of Oregon was right in compelling plaintiffs to elect, then the judgment in the former case is not a bar to this action, because the complainant has never had an opportunity to be heard, and he is not to lose his rights for not litigating them in a case wherein the law will not permit them to be litigated. If the court was in error, it still prohibited them from litigating the claim in that action, and deprived the parties of a right by compelling them to elect one cause of action, and omit the other. In either case, without any fault of their own, they have in fact been afforded no opportunity to be heard at all on their present cause of action. They did elect, and the wisdom of that election was vindicated by the judgment of the highest court in Oregon, which sustained the title ultimately relied on in that action, and decreed the appropriate relief; but that court also turned out to be in error, and the decree was reversed by a still higher tribunal. Shall complainant now be cut off from procuring an adjudication of his rights because, under such circumstances, the court erroneously prevented him from having it adjudicated before? It is, undoubtedly, well settled, that wherever any matter is directly in issue, and actually determined, by a court of competent jurisdiction, the determination is conclusive between the same parties and their privies, whenever the same matters again arise, even though collaterally. It is said in La Guen v. Gouverneur. 1 Johns. Cas. 492: "The principle, however, extends farther. It is not only final, as to the matter actually determined, but as to every other matter which the parties might litigate in the cause, and which they might have had decided." And this general principle is repeated in similar language in many subsequent cases. But the language is general, and must be considered in connection with the facts of the cases wherein it is used. The case cited affords as good an illustration as any of the principle upon which the rule is founded. The principle is, that an end should be put to litigation; that parties should not litigate their rights by piecemeal; that they are bound to be diligent, and when called upon to litigate their claims, they ought to present all they have to say, and that it is negligence to omit anything within their knowledge which might be available; and, if an omission is made, the consequences must fall upon the negligent party. Negligence of the party himself is the main element of the principle upon which the rule is founded. Says Mr. Justice Radcliffe, in the case cited: "It is evidently proper to prescribe some period to controversies of this sort, and what period can be more fit and proper than that which affords a full and fair opportunity to examine and decide all those claims. This extent of the rule can impose no hardship. It requires no more than a reasonable degree of vigilance and attention." Again (page 495), after stating that if the rule as stated is established, he says: "The only inquiry is, whether respondents, under the circumstances of the case, would have been permitted to make a defense on the trial at law, on the ground of the fraud which they now allege?" So, in the same case, Mr. Justice Kent says: "Every person is bound to take care of his own rights, and to vindicate them in due season, and in proper order. This is a sound and salutary principle of law. Accordingly, if a defendant, having the means of defense in his power, neglects to use them, and suffers a recovery to be had against him in a competent tribunal, he is forever precluded." Id. 504. "All the testimony now produced was, for anything that appears to the contrary, equally within their power then as now, and yet no effort was made to produce it. * * * They were guilty of gross and palpable neglect in thus slumbering upon this ground of defense, and must now be precluded from setting it up as a cause of equitable relief against the verdict. It is crassa negligentia if a party does not seek after a thing of which he is apprised, and, in law, amounts to,

notice. So, whatever is sufficient to put a party on inquiry, is good notice in equity. If I am not mistaken in the principles which I have laid down, their application to the case before us is direct and pointed, and they operate with irresistible and conclusive efficacy to produce the result." Id. 504, 505. Now, what is the great principle which the learned judge so earnestly insists upon as excluding the defense, but negligence of the parties to avail themselves of the opportunity before afforded to bring forward their defense and have its merits determined? There had been a judgment for money recovered at law for proceeds of the sale of certain goods. Defendants then filed a bill in equity to restrain the collection of the judgment on the ground of fraud in representations as to the kind and quality of the goods, which fraud was available as a defense to the action at law, and was known to the defendants at the time, but which they did not attempt to set up, and this neglect is the principle upon which the former judgment is held to be conclusive. In the case now in hand, this element of negligence is wholly wanting. The parties did set up this cause of action in connection with the one ultimately relied on, and sought to have it determined, but the court refused to permit them to be joined, and required the plaintiff to elect one and omit the other, and this ruling must be presumed to have been obtained at the instance of the defendant, Stark, as it was made against the protest and the exception of the plaintiffs, duly taken, and noted in the order itself. Does it lie in Stark's mouth now, after procuring such a ruling, and forcing plaintiffs against their protest, under the order of court, to omit one cause of action, to say that plaintiffs might have litigated the claim in that action, and, because they did not, must now be precluded? I think not. They sought to litigate it, but were not permitted to do so. The opportunity was refused them. They were not in fault. Suppose Stark had been in possession and brought suit against the Starrs to quiet his title, and they had set up both grounds of equitable relief in the answer, and evidence on both issues had been received, and a decree entered in favor of the Starrs upon the city title only, the court expressly declining to pass upon the other, on the ground that it was unnecessary to consider it under the view taken, and this decree had become final by affirmance, neglect to prosecute any appeal, or otherwise, would it be pretended in another litigation between the same parties, whose rights, under the claim of title not passed upon, are in question, that the former adjudication would be a bar because it was presented and evidence taken, and might have been determined if the judge had seen fit to consider and decide it? Such is, certainly, not the doctrine of the authorities, as will appear by a number of cases cited in Caperton v. Schmidt, 26 Cal. 479. If it were so, the conclusiveness of the judgment would rest upon the discretion, negligence or something else, of the judge, over which the parties have no control, and not upon the diligence, good judgment, or other acts of the parties themselves.

But it is earnestly argued, by defendant's counsel, that the ruling of the court, that plaintiffs could only be heard upon one of their causes of action, and compelling them to elect upon which they would proceed, cannot affect the operation of the decree as a bar to this action; that they had a right to be heard upon every ground they had upon which to demand the relief prayed; that the refusal of the court to allow them to be heard, was error, and should have been corrected in the same case on appeal; and, that it cannot be reached in a collateral proceeding in another suit to establish the same right or procure the same relief, and several authorities are cited as sustaining the proposition. There appears to me to be some confusion of ideas in this part of the argument, and a misapplication of the legal principles invoked.

The authorities cited, properly applied, seem to me to overthrow the main proposition sought to be established. The first authority cited is Cocke v. Halsey, 16 Pet. [41 U. S.] 71. In that case (page 87), the court say: "The correct legal principle applicable to such proceedings is this: That in every instance in which a tribunal has decided upon a matter within its regular jurisdiction, its decision must be presumed proper, and is binding until it shall be regularly reversed by a superior authority; and cannot be affected, nor the rights of persons dependent upon it be impaired by any collateral proceeding. This principle has been too long settled to admit of doubt at this day, as in the cases of Thompson v. Tolmie, 2 Pet. [27 U. S.] 157; U. S. v. Arredondo, 6 Pet. [31 U. S.] 720; Voorhees v. Bank of U. S., 10 Pet. [35 U. S.] 473; and Philadelphia & T. R. Co. v. Stimpson, 14 Pet. [39 U. S.] 458." Now, what was the adjudication in the case under consideration? Clearly, not that the cause of action omitted under order of the court was invalid, but that the plaintiffs could only be heard in that particular suit upon one of the causes of action alleged, and that they must elect upon which they would proceed, and withdraw the other. This was clearly an adjudication in the progress of the cause, which the court had jurisdiction to make, and the determination is as conclusive as any other made in the progress of the cause. It was an adjudication between the parties, at the instance and in favor of one, against the other. An adjudication, not that plaintiffs could not be heard at all on that cause of action, but that both causes, on both grounds, for equitable relief, could not be heard in the same action, and that they must elect upon which they would proceed and withdraw the other. Suppose, after making their election under the

order, and proceeding upon their last amended complaint, as they did do, the decree of the court had been for the defendant instead of the plaintiffs, as it was, and the plaintiffs had appealed upon the sole ground that they had been compelled to elect and withdraw their other ground of relief, and the supreme court had affirmed the decree, holding that the two grounds of relief could not be heard in that action, that decision, whether right or wrong, would have settled the question by a direct adjudication, that the law of Oregon would not permit litigation of the two grounds of relief in one action. The decree in that case, would clearly not have been res adjudicata as to the cause of action which plaintiffs were compelled to withdraw, for the very rule invoked is, that the judgment or decree is conclusive, not only upon all matters actually litigated and determined, but upon all that might be litigated in the action; and as, by the law thus settled, the omitted ground of relief could not be litigated in that action, the case would not be within the rule invoked at all. The adjudication by the circuit court is no less conclusive. It stands unreversed on that point. Right or wrong, it is finally determined, and is res adjudicata between these parties, and, if erroneous, cannot be reviewed collaterally in this or any other action. The ruling has the same effect, and is as conclusive as if it had been rendered by the court of last resort. It settles the question between the parties and their privies; and so the authorities cited in principle hold. The adjudication is, that the cause now relied on could not have been litigated in the former action, with the ground of relief therein actually determined. It goes no further, and this is conclusive on that point. There has, then, been no negligence on the part of the plaintiffs—no laches—no opportunity presented of which they were bound to avail themselves, conceding the determination to be erroneous. So long as the ruling did not shut the plaintiffs off from any hearing whatever, but only adjudged that they must pursue their remedy on that ground of relief in another action, they were under no obligation to have the error corrected. It left the road to another action open. It did not purport to cut them off from a hearing, and did not determine that there was no cause of action. And, so long as it did not do this, it did not matter to them whether they presented that ground of relief in this or in another action. To the plaintiffs it was only a matter of convenience. It would doubtless be less trouble to pursue the remedy in another action, than to attempt to correct the error in the one pending. Besides the plaintiffs were not in a position in which they could appeal. That determination was not a final decree from which an appeal could be prosecuted. It was an interlocutory adjudication. The appealable decree was in their favor on the other ground of relief, and plaintiffs could not appeal from a decree in their favor, nor could they have errors committed against them in the progress of the cause occurring before the trial corrected on Stark's appeal. On such appeal the question would not be presented. They, therefore, had no opportunity to correct the error, had it devolved upon them to do so, in order to procure a hearing upon the cause of action which they were compelled to withdraw. It is urged by complainant's counsel, that the two grounds of relief sought by the Starrs in the former suit, present causes of action so wholly distinct and independent, that they were not bound to litigate them in one action, even if it was admissible to do so. One cause went upon the theory that the legal title vested in the city of Portland by virtue of its patent for the use and benefit of the actual occupants, who as to these lots, were the Starrs, and that Stark had no title at all. The relief sought on this theory was in fact to remove a cloud upon a title already good. The other cause of action goes upon the theory that the legal title is in Stark by virtue of his patent, but that, by reason of equities arising between the parties themselves, the plaintiffs had the equitable right, and were entitled to a conveyance of the legal title. The case of Morris' Adm'rs v. Stuart's Adm'rs, 1 Iowa. 375, seems to be directly in point in favor of complainants on this question. But whether this case is correctly decided, I need not consider, for my conclusion is, that the former proceedings are not a bar to this action, on the grounds already indicated.

As to the equities disclosed by the bill and the evidence, the first objection in logical order arises on the conveyance to Chapman. It is said, firstly, that the power of attorney to Chapman was insufficient; and, secondly, if sufficient, that it was incompetent for Chapman, as attorney for Lownsdale, to execute a deed for Lownsdale to himself. The power is "to transact and superintend my business in said territory during my absence; to do anything pertaining to my interests in Oregon which he in his judgment may think advisable, particularly in signing deeds to Portland lots." The only business in Oregon which Lownsdale appears to have been engaged in at the time was selling town lots in Portland. And this power seems broad enough to cover it. The language, it is true, is by no means technical, and is liable to criticism; but considered in relation to the known situation of the parties, and the condition of things existing at the time, the intention of Lownsdale can hardly be doubtful. The act of the attorney in executing a conveyance for, and in the name of the principal to himself, may well be regarded as extraordinary. But whatever view might be taken upon these points, if there was nothing more, other facts must be considered. Chapman himself had already the title to one third of all the interest ever

claimed by Lownsdale from Pettygrove, and Coffin owned another third, and it is not even suggested that Coffin's interest did not pass to Chapman by his conveyance. This vested in Chapman at least two undivided thirds of the lots conveyed in block eighty-one, if Lownsdale derived the title to the whole from Pettygrove, or two thirds of one half if Stark really owned one half as claimed by him. In fact the legal title to Lownsdale's entire interest purports to have been conveyed to Coffin by the deed under which Coffin became an owner. The deed is absolute on its face, and purports to convey the whole, and it is only by the accompanying agreement, executed between Coffin and Lownsdale at the same time by which it appeared, that it was to be held partly in trust for the benefit of Lownsdale, that the latter retained any interest at all. See Lamb v. Davenport [Case No. 8,-015; 18 Wall. (85 U. S.) 307]. In this aspect the legal title to the two thirds of the possessory title passed to Chapman by Coffin's agreement, vesting in him the legal title to the whole, irrespective of Lownsdale's joining in the deed. But however this may be, Lownsdale was the only party entitled to complain, and he does not appear to have ever made any objection. He acquiesced in the transaction, accepted the lot conveyed to him at the price fixed and charged in the accounts of the parties at the time of the conveyance, and these accounts on Lownsdale, Coffin and Chapman on that basis. Chapman went into actual, several possession, and held till he conveyed to his vendees, who improved and have ever since occupied the lots without any claim on the part of Lownsdale. As between Lownsdale and Chapman, this certainly vested in Chapman all the right which could at that time be transmitted by Lownsdale, and Chapman acquired at least the equitable title to the whole. He already had the legal title to the possessory claim to the greater part.

The next question arises out of the deed of March 1, 1850, executed at San Francisco, by Lownsdale and Stark, by which they attempted to adjust and settle the conflicting claim of Stark to one half interest in the Portland land claim, and the subsequent modification and ratification as modified of this contract. It is claimed that there is no privity between complainant and defendant; that this deed is a contract between Lownsdale and Stark alone; that in the subsequent modifications Lownsdale is no party, and that Coffin and Chapman assume to modify Lownsdale's contract without authority; and that the language of the modifying agreements is insufficient, in various particulars, to accomplish the object claimed. Like other contracts of that time relating to lands in Portland, the language of these various instruments is doubtless open to much criticism. But in construing such instru-

ments we must consider them in the light of the situation of the parties, and condition of things which gave them birth. We must place ourselves, so far as it is possible to do so by the use of extrinsic evidence now available, in the seats of the parties themselves at the time of the execution of the contracts, and examine them in view of the surrounding circumstances. Kimball v. Semple, 25 Cal. 449. And we may also consider subsequent acts of recognition tending to show the construction put upon them by the parties themselves to the instruments. Mulford v. Le Franc, 26 Cal. 110, 112; Steinbach v. Stewart, 11 Wall. [78 U. S.] 576; Le Roy v. Beard, 8 How. [49 U. S.] 468, 469; French v. Carhart, 1 Comst. [1 N. Y.] 102; U. S. v. Appleton [Case No. 14,463.]

Examining the transaction, and construing these instruments by the aid of these well settled rules, I think there will be little difficulty in arriving at the true intent of the parties executing them. It is true, that the ostensible parties to the instrument are Lownsdale and Stark, and for reasons sufficiently obvious, when the circumstances are considered. They were both in San Francisco, and Lownsdale, so far as anything to the contrary appears, without any power of attorney to act for his associates in the settlement of the controversy. He could not, therefore, make the compromise for them. It was manifestly contemplated that there were other parties whose assent it was necessary to obtain; and their assent was provided for in the only way practicable at the time, by a covenant on the part of Lownsdale inserted in the said indenture of March 1st: "That in case any person or persons holding or claiming under him (Lownsdale), except the holders of those lots and under the conveyances especially hereinbefore confirmed by the said party of the first part (Stark), shall refuse to ratify and confirm this indenture, he, the said party of the second part (Lownsdale) will, at the option of the said party of the first part (Stark), at any time within six months from this date cancel this indenture, and release all rights acquired under these presents by the parties hereto." There can be no doubt to whom this covenant referred, because Stark knew before of, at least, Lownsdale's conveyance to Coffin. Coffin and Stark had before this time had a full discussion of their respective claims to the Portland land claim, as Coffin distinctly testifies, and there is nothing to the contrary, except the unsatisfactory general allegations of the answer, although Stark was himself a competent witness, and could have testified to the contrary had Coffin's testimony been incorrect. Besides, on September 26, 1849, at the same time when Stark executed the power of attorney to Couch, mentioned in the statement of facts, it was also accompanied by a letter of instructions to Couch, bearing the same date relating to the subject matter of the power.

in which he says: "With this you have from me a power of attorney of the fullest character, under which, during my absence from the territory, you can look out for all my interests, particularly with reference to my interest in the Portland town claim. As regards my claim, I wish you to notify Mr. Coffin as soon as he returns, of the true position of things, and, if possible, have the difficulty concerning my undivided half settled." And again gave directions how to proceed if, "after the return of Mr. Coffin, the matter can be brought no nearer to a settlement upon just and equitable principles." In this letter of instructions he does not mention Lownsdale at all, but treats Coffin as the man with whom his controversy existed. Lownsdale's deed to Coffin had been made in March previous, and being a deed absolute on its face, he may have supposed at that time the whole title to be in Coffin. Indeed, prior to the conveyance to Chapman, Coffin and Lownsdale acted themselves as though the entire legal title was in Coffin, for Lownsdale when he sold a lot did it as attorney for Coffin, as will be seen by reference to Lamb v. Davenport, already cited. But however that may be, it is clear that Stark knew of Coffin's interest. Although there is no direct evidence of the fact, it is altogether probable that he was also aware of Chapman's interest; for it is highly improbable that Lownsdale would have entered into the arrangement without disclosing it, and there is nothing in the testimony to justify the inference that he did not know of it. There can be no doubt, I think, that Coffin and Chapman were the parties had especially in mind in making this covenant, although not mentioned by name. Perhaps these general terms were used in order to embrace any others who might have held such conveyances unknown to Stark. But whether Coffin and Chapman are, or are not, the parties specially referred to, they are clearly embraced in the terms of covenant. The assent of Coffin and Chapman to this settlement, and the ratification of the indenture by them was regarded as essential, and provided for in this way. It was, therefore, contemplated that they were in fact, though not named as such, parties to said transaction and indenture, as well as Lownsdale and Stark.

Lownsdale returned to Portland on or about April 13, and brought to Coffin and Chapman the first information of the execution of the said indenture by Lownsdale and Stark. They promptly declined to ratify it. After some negotiation between Coffin and Chapman on one side, and Couch on the other, who acted for Stark, claiming to have authority for that purpose, the two instruments, one dated April 13, 1850, signed by Coffin and Chapman, and the other April 15, 1850, signed "John H. Couch, for Benj. Stark," set out in the statement of facts, were indorsed on the said indenture of March 1, and executed by the parties, and from that time forward the several parties and their grantees were in possession and exercising acts of ownership in accordance with said agreements and modifications without let, hindrance, objection or adverse claim from the other till after the patent to Stark issued.

Some questions have been made upon the construction of these modifying and ratifying instruments. It is claimed that they are not ratifications, but modifications if anything; but are not the latter, because they are not the agreement of Lownsdale at all, who is claimed to be the only party, and that Chapman and Coffin had no authority to act for Lownsdale in modifying his agreement; that it only purported to ratify sales of lots made by Lownsdale either in person or by his lawful attorney, etc.

In view of the rules of construction cited; the relation of the parties to each other, and to the lots; and of the condition of things already stated, the language, however inartificial, appears to me to be susceptible of but one reasonable construction. Chapman and Coffin were deemed to be the parties in interest, whose assent to the indenture of March 1, it was considered necessary to obtain, and which was sought to be secured by the covenant already considered. In the modifying instruments they were acting for themselves with respect to their own interests and not for Lownsdale merely. They were unwilling to accept all the terms of the compromise made by Lownsdale and Stark; but were willing to accept them in part. They insisted that all the property disposed of since January 1, up to the time of receiving notice of the compromise, should be placed on the same footing with the property sold prior to January 1; and this being acceded to by Couch on behalf of Stark, they indorsed upon the indenture of March 1, a supplementary agreement, whereby they "ratify and confirm" that agreement between Lownsdale and Stark "respecting an adjustment of title, hereby placing the disposition of property up to notice of said adjustment upon the same footing with the disposition of property before the first day of January last." The plain meaning of which is, that the contract made between Lownsdale and Stark shall be modified to this extent, and the contract as so modified, ratified and confirmed. This modifying clause does not limit the enlargement to lots sold by Lownsdale individually since January 1. Its terms are general—"the disposition of property up to notice of said adjustment"—that is to say, all property sold or otherwise disposed of. It is perfectly obvious that the object was to take out of the conveyance to Stark, all the property which Coffin and Chapman in prosecuting the business of what they call in their own agreements, "the partnership in selling town property," all those lots disposed of during Lownsdale's absence from about the first of January

till his return on or about April 13. Lownsdale having been absent during all that time had in person disposed of none. But Coffin and Chapman had remained at home and continued to dispose of the common property, and these are clearly the dispositions intended by the modification insisted on. It is equally obvious that the instrument signed by Couch for Stark and appended to that executed by Coffin and Chapman, to-wit:—"I ratify the above agreement as far as my interest is concerned in said property," was intended to ratify the indenture between Lownsdale and Stark, as so modified and agreed to by that of Coffin and Chapman. If Couch had authority to sign the latter, or if it having been signed by him for Stark, the latter, after being informed of the facts, acquiesced in and adopted it, then the contract so modified finally became the real and only contract between the parties, and all property disposed of subsequent to January 1, and before April 13, stood upon the same footing as that disposed of before January 1. That is to say, Stark by the terms of the first covenant in the said indenture, thus extended in its scope by these modifications thus adopted, in the language of the covenant, "so far as his right, title and interest are concerned, ratifies and confirms all conveyances of" lots disposed of by Coffin, Chapman and Lownsdale as owners of the Portland land claim through Coffin and Chapman, from January 1 to April 13, as well as those to the lots sold before January 1, particularly enumerated in the covenant; and this embraces the lots in controversy.

It is next insisted that Couch had no authority to make this modification, and it is, therefore, not binding on Stark. We have seen that a power of the most general character was given by Stark to Couch, his mercantile partner, September 26, 1849, in which the authority to Couch is in these words: "to do any and all acts during my temporary absence which I might myself do were I personally present," without more particular specification or limitation. So, also, in an accompanying letter upon the subject matter of the power, in which he directs Couch to notify Coffin, as soon as he should return, of the true position of things with reference to the interest claimed by Stark in the Portland land claim, "and, if possible, have the difficulty, concerning my undivided half, settled." This letter shows that the power of attorney was intended to cover this very matter, and that he expected Couch to settle his controversy with Coffin in relation to this claim. It shows that Stark intended the power to be broad enough to settle this controversy. If it is not, the letter is, and it does not matter whether the authority is conferred by a formal power or by letter. Lee v. Rogers [Case No. 8,201]. It is sufficient that the authority is given, and directions to do a specific thing embraces power to act. Now this is precisely what Couch did with Coffin

and Chapman, the latter having in the meantime, through conveyance from Coffin in part. at least, become interested with Coffin and Lownsdale.

It is claimed that this power, whatever it authorized, had been revoked; but there is no evidence, other than by implication, that it had been revoked at the time. Another full power of attorney, given to George Sherman, dated January 17, 1850, was introduced, and claimed to be a revocation of Couch's power in the case of Failing v. Stark [Id. 4,-606], but I do not find it in evidence in this and the other cases. But suppose it to be in evidence, that power does not purport to revoke Couch's power, and if it does revoke it, it is by implication only, and that implication arises only from the fact that a second power has been given, embracing the same subject matter. It is by no means clear that it does embrace the entire subject matter. While it is a very full power, authorizing Sherman to prosecute claims to land against individuals, and the government, and to lease and sell lands, it does not in express terms, or by reasonable construction, appear to me to authorize him to compromise or adjust this claim. It may well be that Stark would be willing to entrust his clerk, a young man, with power to prosecute or sell, while he would reserve to his more experienced partner's discretion and judgment the authority to settle or compromise by yielding a part to secure the remainder of his claim. But, if otherwise, I am not aware that giving a second power to another necessarily constitutes a revocation of the former power. I do not know any reason why two different persons may not be empowered to do the same thing. It has been held that they may. Davol v. Quimby, 11 Allen, 208. Where not absolutely inconsistent the construction must be determined by the circumstances, and from these I see no reason to suppose that Stark intended to revoke Couch's power in the particular under consideration. The circumstances indicate the contrary. At the time of the execution by Couch of this instrument ratifying the modification made by Coffin and Chapman, Couch had in his possession the said indenture of March 1, between Lownsdale and Stark, to which these modifications were appended. It must have been sent to him by Stark to be used in connection with the agency claimed under the power before given. Stark must have sent it up to him at about the same time Lownsdale returned. The fact that it was sent to him by Stark would indicate that his agency was intended to be still continued with reference to a settlement of this controversy. It was contemplated that something further was to be done by way of procuring the assent of Coffin and Chapman to the settlement, and somebody must attend to it. Besides, Sherman was himself a clerk in the employ of Couch and Stark. And it is quite clear from the evidence that he, too, was consulted, took part

in, and assented to. the arrangement, although Couch actually executed for Stark the assent to the modification of the agreement. So, also, Sherman himself acting for Stark put the agreement with the modifications appended by Coffin and Chapman, and by Couch on the records, and·this, too, after Stark himself had been at Portland in June, and been informed of all these transactions, and it will be presumed under the circumstances by Stark's directions. This itself was an act of acceptance and adoption.

In addition to this, Stark himself, while at Portland in June, called upon Coffin and Chapman for, and was furnished by them with, a list of all property disposed of by them prior to the date of said modification. He stated to Coffin at that time, or on the steamer during his return voyage to San Francisco, that he would sanction the contract or submit to it, and carry out its provisions, and his subsequent acts, and the acts of all parties interested down to the issue of the patent—a period of ten years—are ·consistent with that idea, and totally inconsistent with any other. Stark was in possession and exercised acts of ownership over the part ·conveyed to him by the modified contract ,from that time, without setting up any claim ·to that released to Lownsdale, Coffin and Chapman, and the latter continued in ·possession, and exercised acts of ownership over the part released to them, without setting up any adverse claim to Stark's portion. Stark ·did not exercise his option to annul the contract within six months under the covenant in the indenture with Stark authorizing him so to do in case those having conveyances ·from Lownsdale should refuse to ratify the contract, and manifestly for the reason that he acquiesced in the contract as modified, and ·regarded that as a final settlement of the controversy. He availed himself of the right and undisputed possession thus acquired to procure his patent. Up to the date of his agreement with Lownsdale, Stark never claimed to have more than an undivided half of the Portland land claim, and the title to two thirds of the other undivided half of the entire tract north of the line agreed upon in the indenture of March 1, as well as to block 81, was in Coffin and Chapman at that date; and the only means by which Stark acquired his right to the possession of their share in any part of it, or any several possession by which he was enabled ·to obtain his patent at all to any part, was through this modified contract. He could not adopt that part which was beneficial to himself, and reject it so far as it was beneficial to Coffin and Chapman; and he manifestly did not attempt to do it, until he had fortified his position ten years afterward by a patent from the United States, conveying to him the title to the land.

I have only referred to the salient points of . the evidence,. without any attempt at a discus∙ sion of the particulars, and I content myself with indicating the result forced upon my mind, and saying, that in my judgment, no unprejudiced mind can examine the evidence and fail to reach the conclusion that Stark fully acquiesced in, adopted, and acted upon the modifications of the contract made by Coffin and Chapman on the one part, and Couch for Stark on the other, in the sense adopted in this opinion; and, that, as a result, he realized a fortune, or might have done so, if he did not, that might well have satisfied his ambition, without any encroachment upon the rights that ought to have been secured without let or hindrance on his part ten years afterward to the other parties and their privies to those transactions. And more, it is equally manifest from the evidence, that while there was no written covenant on the part of Stark to that effect, he held out by his acts and express declarations to the purchasers from Lownsdale, Coffin and Chapman, and in particular to complainant and his brother, one of complainant's grantors,· and for a time a joint owner, unmistakable assurances upon which they were entitled to rely with confidence. that if he obtained his patent to his general claim he would convey to them the lots they had purchased. He expressly so told both the Starrs with reference to the lots held by them at the time, and to those other lots purchased by others from Chapman, and made similar declarations to some, if not all, of Starr's other grantors. The complainant himself purchased one half of lot two from Chapman as early as October 3, 1850, and in December of that year he erected a tin shop on it and occupied it. From that day till the filing of the·bill in this case, he has occupied . it for mercantile purposes. In October and November, 1850, and January, 1851, Chapman sold the other lots in controversy, and the purchasers soon after entered, improved and occupied in like manner, and their respective titles were acquired by Starr at various times before the issue of the patent to Stark—some before and some after Stark's said declaration to him—and the occupation continued, without adverse claim or hindrance on the part of Stark. A warehouse had been built upon one of the lots, even before Lownsdale acquired his interest from Pettygrove, and this Chapman occupied by himself, or tenants, while he claimed the lot under the conveyance before set out. The Starrs were joint owners and occupiers of parts of the lots during a ·portion of the time from 1850 to 1860, and while so occupying, Stark repeatedly told them, that the title to their lots, and the others in the same situation, was good; and .that when he got his patent he would convey .the legal title to the owners of ·the possessory right. He stated to complainant, that if lot owners would go in with ·him, and assist in getting title, he would make lot holders good titles. And Starr says, that he and his brother "rendered assistance by not· opposing him in getting his patent," and "by talking to

others to get them to acquiesce in it, believing that he would make good their title, and in various other ways." One of these conversations was had at the very time when Stark was going to obtain his certificate of location, which was not obtained till the fall of 1853. Stark returned to Portland about October, 1850, and with brief temporary absences resided and did business in person within a short distance of this property, till he got his patent in 1860. During this time he had repeated conversations with the Starrs, and consultations and joint actions in litigating other matters affecting the value of this property, and of other property which Stark himself owned; and during all this time no claim was ever set up, or intimated by Stark adverse to Starr, or the other purchasers of the property from Chapman.

Such is the result of the testimony of the Starrs, confirmed by other testimony, with none of any importance to oppose it. There it nothing to impeach its credibility beyond the coloring which the interest of the parties, however honest, may be supposed to give. But Stark is a competent witness, also, and it is but fair to presume that if he could have truthfully denied, or qualified in any material degree, the accuracy of the testimony given, he would have offered himself as an opposing witness upon these specific points, and submitted himself to a cross-examination in the manner usual with other witnesses. He has not done so, other than by the loose and general allegations in his answer to the bill; and I see no good ground for doubting the substantial correctness of the facts as stated. They harmonize with the acts and uniform conduct of Stark in relation to the matter. These further considerations not only go to establish beyond all doubt the conclusion that Stark fully acquiesced in and adopted the modification of the contract with Lownsdale, assented to by Couch for him, but also show that the complainant and his grantors had every reason to believe, so far as acts and verbal promises can go, that Stark would obtain the title to the lots so embraced in the modified contract for the benefit of the purchasers from Chapman; and that the complainant, and those under whom he claimed, acted upon that idea, and permitted Stark to prove up his claim without any opposition from them. These are not mere loose general rumors—general expectations entertained by the public at large as to what the proprietors of this land claim would do in the event of procuring title from the government, but they are specific personal statements by Stark to Starr himself, and to those from whom he derives title, and in respect to these specific lots. And complainant derived title to some of them after these conversations, and to all of them after Stark, by his acts, had fully manifested his approval of the modifications of the contract in question. In these particulars the complainant appears to me to stand

in a much stronger position than Davenport in the case of Lamb v. Davenport, and in an equally strong position in every other particular except one, which will be considered in its proper place.

It follows that, whatever interest in the lots in controversy had been acquired by Pettygrove and Lovejoy, under whom Stark claimed, by virtue of a settlement, improvement and occupation commenced in 1848, and continued in their grantees as stated, including Stark, became fully vested in Chapman, and were by him either conveyed directly to complainant Starr, or to others, who subsequently conveyed to Starr. As between complainant Starr and defendant Stark, the complainant has all the right, title and interest that it was possible for Stark to convey on March 15, 1850, the date of the modification of the indenture of March 1, 1850, by Couch for Stark, and subsequently acquiesced in by him in the manner indicated, and this included the initiation of the four years' possession dating from September previous, subsequently perfected into a full title by the patent issued in virtue of that possession. At that time the donation act had not been passed, consequently Starr acquired, through Chapman and the other parties before mentioned, all the title it was at that time possible to acquire, a title against all the world except the United States. The donation act having been passed in September, 1850, Stark afterwards filed his claim under that act, dating the possession upon which he relied, and which he afterwards proved up, and upon which the patent issued, from September 1, 1849—from which time his right subsequently perfected by his patent dates—some seven months prior to the final compromise between Stark and Lownsdale, Coffin and Chapman. By that compromise, the right to the very possession of these particular lots upon which the patent issued passed, as the actual possession had before passed to Chapman, and afterwards through him to Starr. Stark was not in fact in possession of these lots at the date from which he dates his settlement, nor at any time afterwards during the four years, while his possession was required to be continued to entitle him to a patent, as we have seen. During all that time it was in the occupation of Starr and his grantors. It follows that unless he obtained the title for the benefit of those who had purchased under the circumstances stated, he either committed a fraud upon them, or else upon the United States and the law, for the law did not grant, or intend to grant, to one party, land which he never possessed, but which at all times was actually in the occupation of another.

The only particular in which Davenport occupied a better position in respect to the title to the lots claimed by him in Lamb v. Davenport, than Starr does in this, is, the equity claimed by him under the fourth covenant in the instrument executed between

Lownsdale, Coffin and Chapman, commonly known as the escrow, which will be found set out in the report of that case. That covenant does not apply to this case. In other respects Starr's equity is equal to, and in some particulars, as we have seen, stronger than Davenport's. The supreme court has recently decided that case on appeal, and the bearing of its decision upon this case will now be considered. The circuit court rested its decision upon the fourth covenant of the escrow, as expressly obligating Lownsdale to convey the legal title, in case he should obtain it from the United States. While the supreme court affirmed that view, it is believed that an attentive consideration of the decision cannot fail to satisfy the inquirer that it is much broader in its scope. The supreme court say: "We are satisfied that by the true intent and meaning of these agreements, the equitable right to all the lots in controversy had been transferred by Lownsdale to Coffin before the passage of the donation act, and that, as between Lownsdale, Coffin and Chapman, the equitable interest, such as we have described it, of the lots in controversy, was in Coffin or his vendees. The record shows that this interest or claim, whatever it was at the commencement of this suit, was vested in Davenport, while the legal title was in the heirs of Lownsdale. According to well settled principles of equity often asserted by this court, Davenport is entitled to the conveyance of this title from those heirs, unless some exceptional reason is found to the contrary."

Now the agreements referred to by the supreme court by which "the equitable right to all the lots in controversy had been transferred by Lownsdale to Coffin before the passage of the donation act," and, "was in Coffin or his vendees," were the agreements prior to the escrow, for that was not executed till long after the passage of the donation act, and it did not purport to transfer any interest in these lots at all. It was simply an arrangement for their own future action. After discussing the validity of the escrow, notwithstanding its execution after the passage of the donation act, the court proceeds: "And if this latter agreement is rejected as altogether void, it is still apparent that by the contracts made prior to the donation act, the equitable right of Coffin to these lots is sufficiently established." Coffin's individual conveyances to Mills and Cheeny, under which Davenport claimed title, were not made till after the passage of the donation act, and to sustain these conveyances under the act, the court very properly distinguished Coffin's right as an individual lot holder through mesne conveyances from the town proprietors and donee, from Coffin's right as general claimant and holder of the Portland land claim and general town proprietor. The court say, in reply to the objection to the validity of the conveyances to Mills and Cheeny:

"The answer is, that Coffin is not the donee, who takes title under the act of congress, but Lownsdale; and Lownsdale had made a valid agreement by which his interest in them was transferred to Coffin before that statute was passed." The conveyance by which the lots then in question passed from Lownsdale, donee, and Coffin as general claimants and town proprietors, to Coffin as as individual lot holder under the general claimant, is the conveyance made to Marshall, the substance of which is given in Lamb v. Davenport. Marshall having resold the lots to Coffin as an individual, the latter subsequently conveyed them to Mills and Cheeny. This conveyance to Marshall is a simple quit-claim deed, without any covenant at all as to a future procurement of title, or for conveyance of title should it be procured. Or, if we consider the conveyance from Lownsdale to Coffin, of March 30, 1850, Exhibit C of the evidence in the case now in hand, as the one referred to by the supreme court under which the title of Lownsdale, donee, passed to Coffin, as purchaser, it is also but a quit-claim deed, equally barren of covenants. The equity of Davenport in that case, then, as against Lownsdale, the patentee and donee under the donation act, rested entirely on a quit-claim deed made under the circumstances detailed in that case. The court, then, distinctly hold in that case, that a quit-claim deed made in view of the condition of things existing at Portland at the time the various transactions considered occurred, gives an equity against the grantor, who subsequently obtains the legal title under the donation act, under the circumstances disclosed in that case. In fact, this ground of decision is, if possible, more distinctly brought out than the other, and is suggested as a ground free from doubt, even if the other were doubtful. Both points were fairly and directly presented by the record, and the decision might as well have been put upon one as the other, and both are distinctly determined. We can, therefore, no more say that one was not directly adjudicated than the other. But if we can, the court manifestly rest more directly and confidently on the equities derived from the quit-claim deeds prior to the escrow, than upon the covenants in the escrow; for this is the point, particularly stated, and the only one mentioned in the close of the opinion, where the result is announced as follows: "But we hold, that as to the portion of the land which was allotted to him by the surveyor-general, and the title of which vests in his heirs by the act of 1836 (5 Stat. 31), without which the patent would be void, his contract of sale made before the donation act was passed, and while he was the owner of the possessory interest before described was a valid contract intentionally protected by the donation act itself, and binding on the title which comes to his heirs by reason of his death."

Thus, ex industria, this point seems to be repeated, as the one upon which the court designs principally to rest the decision. The conveyances referred to as made before the passage of the donation act do not embrace the escrow, for that was executed long after the passage of the act; and Davenport had no title whatever under any contract executed before the passage of the donation act, coming from Lownsdale, the donee, other than that by a quit-claim deed, without any further covenants for title. The claimant in the case now under consideration, substantially stands in the position upon the facts stated, of having a conveyance of all of Stark's right, title and interest, on the 15th of March, 1850, which is after the initiation of the possession upon which his title to a patent as donee rested, which was commenced in September before, and was all the title he, or any of the Portland land claimants, was capable of conveying at the time. It conveyed his right of possession and the rights incident to it. Complainant's title is, therefore, in every particular, equal to that of Davenport derived from Lownsdale, under the conveyances made before the passage of the donation act. The complainant, therefore, is strictly within the decision of the supreme court in that case. It is impossible to take the present case out of the rule there laid down. The decision is authoritative, and must control the decision of this case, and I am glad to be able to say that I am fully satisfied, as I think any reasonable mind must be, that the result in this case, and in the several others argued in conjunction with it upon the same, and substantially the same testimony, is in strict accordance with the intrinsic justice of the case. In my apprehension, any other result in these cases would work great hardship and gross injustice. This class of cases is sui generis, and I do not now perceive why the rule established by the supreme court in Lamb v. Davenport would not operate justly in all cases of the same class.

I have given these cases all that careful attention which ought to be bestowed when so large an amount of property, and principles so important, are involved, and have earnestly endeavored to reach a correct conclusion. If I have failed to correctly construe the decision of the supreme court, or have in any other particular misapprehended the law, I am glad to know that my error can and will be corrected by a higher tribunal, and justice ultimately done.

There must be a decree for the complainant in pursuance of the prayer of the bill with costs, and it is so ordered.

DEADY, District Judge, dissented upon the point as to the bar of the former proceedings; also, upon the point as to the effect of a conveyance of his interest without covenants, made by the donee under the donation act, after the initiation of his possession upon which the patent issues, and prior to the passage of that act.

[On appeal to the supreme court, the decree of this court was affirmed. 94 U. S. 477.]

[NOTE. The case of Failing v. Stark, involving the same general facts as the principal case, was decided May 8, 1874, and is here reprinted by permission from 2 Sawy. 642. The opinion of the court was as follows:]

SAWYER, Circuit Judge. This is a bill in equity to restrain the defendant from prosecuting an action to recover the north half of lot three, in block twenty-seven in the city of Portland, and to procure a conveyance of the legal title. The general facts are the same as those fully set out in Starr v. Stark [Case No. 13,317], except that the first conveyance by which the possessory title passed out of the general claimants of the Portland land claim was by Coffin, Lownsdale, Chapman, Hastings and Baker to J. T. Hobbs & Co., Hastings and Baker claiming some interest subordinate to Chapman. This deed bears date March 14, 1850, and is, therefore, one of the lots sold in Lownsdale's absence, and is embraced in the modified contract considered in Starr v. Stark. As to the question discussed in Starr v. Stark the equities in this case are, in all particulars, as strong as in that case, if not stronger. The testimony of Stark himself, given in another matter, was introduced in this case, and he nowhere in this testimony denies that he acquiesced in the modifications to the agreement of March 1, between himself and Lownsdale, made by Chapman and Coffin. He states that Coffin and Chapman ratified the agreement with the modifications; and that he went into the undisputed possession in accordance with that agreement. The plain inference from his own testimony is, that he acquiesced in it. He nowhere in his deposition denies Couch's authority. It is perfectly clear, from all the testimony, that he did accept the modifications made by Coffin and Chapman, and acted upon them as valid. If he expected any money consideration after this modification as to lots sold subsequent to January 1, 1850, he evidently looked to Lownsdale individually for it, and not to Coffin and Chapman. If he did not obtain it, it was a matter between him and Lownsdale personally. There is no defense of res adjudicata set up in this case.

The only other questions arise on defects in the mesne conveyances. Without discussing them in detail, suffice it to say, that a valuable consideration was always paid, and the actual possession passed and continued in the several purchasers with the acquiescence, and without any subsequent claim on the part of the vendors, and enough appears to show that the equitable title of the various, intermediate holders from Lownsdale, Coffin, Chapman, etc., became fully vested in complainant.

Let a decree be entered in favor of the complainant in pursuance of the prayer of the bill with costs.

DEADY, District Judge, dissented on the second point indicated in his dissent in the case of Starr v. Stark [supra].

E. D. Shattuck, for complainant.
W. W. Page, for defendant.

[The case of Bacon v. Stark also involving the same facts as the principal case, and also decided May 8, 1874, is here reprinted by permission from 2 Sawy. 644. The opinion of the court was as follows:]

SAWYER, Circuit Judge. This action embraces the south half of lot four, in block eighty-one, and is, in all essential respects, similar to the cases of Starr v. Stark [Case No. 13,317], and was submitted on the same testimony, so far as the litigated points are concerned, ex-

cept that in this case it is not pretended that the former action is a bar to complainant Bacon's action. On the authority of Starr v. Stark [supra] a decree must be entered for complainant, with costs, and it is so ordered.

DEADY, District Judge, dissented on the second point indicated in his dissent in Starr v. Stark [supra].

J. N. Dolph and William H. Effinger, for complainant.

Wm. Strong and Bronaugh & Catlin, for defendant.